UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

          Chapter 7

In re:

YVETTE MCKENZIE-GILYARD aka
YVETTE GILYARD aka YVETTE MCKENZIE,      Case No. 1-05-14317-ess

           Debtor.

-------------------------------------------------------------x

YVETTE MCKENZIE-GILYARD,

           Plaintiff,         Adv. Pro. No. 06-01343-ess
   - against -

HSBC BANK NEVADA, N.A.,

           Defendant.
-------------------------------------------------------------x

## MEMORANDUM DECISION DENYING
## HSBC BANK NEVADA, N.A.'S MOTION FOR SUMMARY JUDGMENT

Appearances:

Preston L. Zarlock, Esq          Jay S. Fleischman, Esq.
Angela Z. Miller, Esq.           FleischmanLaw, P.C.
Anthony M. DiPaolo, Esq.       315 Flatbush Avenue (Suite 401)
Phillips Lytle LLP           Brooklyn, NY 11201
3400 HSBC Center         Attorneys for Yvette McKenzie-Gilyard
Buffalo, NY 14203
Attorneys for HSBC Bank Nevada, N.A.

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of the Defendant, HSBC Bank Nevada, N.A. ("HSBC"),

for summary judgment on all of the claims asserted by the Plaintiff, Yvette McKenzie-Gilyard

(the "Plaintiff"), in this Adversary Proceeding, dated December 7, 2006 (the "Motion for

Summary Judgment").  HSBC brings this Motion for Summary Judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of

the Federal Rules of Bankruptcy Procedure.  HSBC argues that all of the Plaintiff's claims fail as

a matter of law, and in addition, that this Court does not have subject matter jurisdiction over

certain of those claims.

After consideration of the submissions, the arguments of counsel, and the record before

the Court, and for the reasons set forth below, the Motion for Summary Judgment is denied with

respect to the Plaintiff's claims for violation of the discharge injunction.

## JURISDICTION

This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§

1334(b) and 157(b)(2)(F).  The following constitutes the Court's findings of fact and conclusions

of law to the extent required by Rule 52 of the Federal Rules of Civil Procedure, as made

applicable herein by Bankruptcy Rule 7052.

## BACKGROUND

A.    *Procedural History*

On June 26, 2006, the Plaintiff filed a Complaint (the "Complaint") against HSBC for

violation and contempt of the discharge injunction under Section 524(a)(2) of Title 11 of the

United States Code (the "Bankruptcy Code"); for violation of the Fair Credit Reporting Act, 15

U.S.C. §§ 1681, *et seq.* (the "FCRA"); and for defamation.  Docket No. 1.  The Plaintiff seeks

injunctive relief, actual, statutory, and punitive damages, and attorney's fees and costs.

On July 28, 2006, HSBC filed its Answer (the "Answer").  Docket No. 3.  On January 8, 2007, the Court entered a Stipulation and Scheduling Order setting April 13, 2007, as the date by which the parties must complete discovery.  Docket No. 12.

On December 8, 2006, HSBC filed its Motion for Summary Judgment and supporting declarations seeking the entry of judgment in its favor on all of the claims asserted by the Plaintiff.  Docket No. 8.  HSBC also filed a Memorandum of Law (the "Mem. in Support") in support of the Motion for Summary Judgment.  Docket No. 9.

On February 2, 2007, the Plaintiff filed an Affidavit of Jay S. Fleischman in opposition to the Motion for Summary Judgment (the "Aff. in Opp.").  Docket No. 13.  On February 13, 2007, HSBC filed a Reply to the Affidavit in Opposition (the "Reply to Aff.").  Docket No. 15.  On March 5, 2007, the Plaintiff filed a Supplemental Affirmation in Opposition and Sur-Reply (the "Supp. Affirm. in Opp.").  Docket No. 16.  On April 2, 2007, the Plaintiff filed under seal a further opposition to the Motion for Summary Judgment (the "Opp. to Summary Judgment").  Docket No. 20.  On April 30, 2007, HSBC filed under seal a Reply to Plaintiff's Sur-Reply and Supplemental Affirmation and Opposition to HSBC Motion for Summary Judgment (the "Reply to Supp. Affirm. and Opp.").  Docket No. 22.

On May 8, 2007, the Court held a hearing on the Motion for Summary Judgment at which counsel for the Plaintiff and counsel for HSBC appeared and were heard (the "May 8 Hearing").  Docket Entry dated May 8, 2007.  At this hearing, the Plaintiff stated that she was voluntarily withdrawing her claims for relief for violations of the FCRA and for defamation in this Adversary Proceeding.  May 8 Hearing Tr. at 4:18-20.  On May 25, 2007, HSBC filed a

Supplemental Memorandum of Law in support of the Motion (the "Supp. Mem. in Support"). Docket No. 24.  A continued hearing on the motion was held on August 15, 2007, and the matter was submitted for decision.  Docket Entry dated August 15, 2007.

B.    *The Debtor's Account with HSBC*

The record shows that Household Bank (SB), N.A., a predecessor of HSBC, issued a Seaman's Furniture Company, Inc. ("Seaman's") credit card to the Debtor (Complaint ¶ 7; Answer ¶ 6) and Household Retail Services, a predecessor of an HSBC affiliate, was listed as a creditor by the Plaintiff in her Chapter 7 bankruptcy.  Bankruptcy Case No. 05-14317, Docket No. 1, Schedule F.  According to HSBC, the Plaintiff obtained the Seaman's credit card and established a credit account (the "Account") on February 18, 2002.  Motion for Summary Judgment, Declaration of Angela Miller ("Miller Decl.") ¶ 3(a), Exh. A (Debtor's February 2, 2002 application for a Seaman's credit card).

HSBC states that, on October 15, 2004 (the "Sale Date"), HSBC sold the Account to Arrow Financial Services LLC ("Arrow").  Miller Decl. ¶¶ 3(b), 3(c), Exhs. B (HSBC billing inquiry screen evidencing HSBC's sale of the Account to Arrow) and C (Account Summary of HSBC's sale of 9,979 accounts to Arrow).  According to HSBC, as of the Sale Date, the balance on the Account was $4,866.81.  Miller Decl. ¶ 3(b), Exh. B (HSBC CMS billing inquiry screen evidencing HSBC's sale of the Account to Arrow).  HSBC states that on October 30, 2004, HSBC advised the Plaintiff by letter that the Account had been sold to Arrow and that all payments and inquiries concerning the Account should be directed to Arrow.  Miller Decl. ¶ 3(k), Exh. K (Letter from HSBC to Debtor dated October 30, 2004).  HSBC further asserts that the Plaintiff's Account was one of some 9,979 accounts sold by HSBC to Arrow on the Sale

3

Date.  Miller Decl. ¶ 3(c), Exh. C (Documentation of HSBC's sale of 9,979 accounts to Arrow).

The Plaintiff acknowledges that HSBC sold the Account to Arrow (Opp. to Summary Judgment ¶ 22) but denies that she received HSBC's letter, or any letter, "regarding the alleged sale of [her] account to Arrow," and also states that she "never received a letter from Arrow . . . claiming to own the account."  Aff. in Opp. ¶ 10, Exh. 1 (Affidavit of Plaintiff).  The record indicates that HSBC did not repurchase the account from Arrow, and the Plaintiff did not enter into a reaffirmation agreement with HSBC during her Chapter 7 bankruptcy case.  Motion for Summary Judgment, Declaration of Brian Cutler ("Cutler Decl.") ¶ 4; Complaint ¶ 15.

HSBC sold the Account pursuant to an Account Purchase and Sale Flow Agreement, dated May 15, 2002, entered into by a predecessor of HSBC and Arrow (the "Forward Flow Agreement" or "FFA").  Aff. in Opp. ¶ 15; Reply to Supp. Affirm. and Opp. at 8.  The Forward Flow Agreement provides for HSBC to request that the tradeline for each account be updated to indicate that the account has been transferred and/or sold.  FFA ¶ 7.3 cited in Opp. to Summary Judgment ¶ 18.  In addition, the Forward Flow Agreement provides for HSBC to receive a fee of five percent of the payments received by Arrow on the transferred accounts more than four months after they are transferred.  FFA ¶ 6 cited in Opp. to Summary Judgment ¶ 19.

On March 28, 2005 (the "Petition Date"), some five months after HSBC sold the Account to Arrow, the Plaintiff filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code.  Bankruptcy Case No. 05-14317, Docket No. 1.  On August 17, 2005, the Plaintiff received a discharge.  Bankruptcy Case No. 05-14317, Docket No. 8.  The Certificate of Mailing with Order of Discharge, dated August 19, 2005, states that Household Retail Services, a predecessor of an HSBC affiliate, received notice of the Plaintiff's discharge.  Bankruptcy Case No.

05-14317, Docket No. 9.  HSBC denies that it received notice of the Plaintiff's discharge.

Answer ¶ 8.  The Plaintiff's Chapter 7 bankruptcy case was closed on May 3, 2006.  Bankruptcy

Case No. 05-14317, Docket Entry dated May 3, 2006.

The Plaintiff asserts that on April 28, 2006, she requested that Experian, Equifax, and

TransUnion "reinvestigate all tradelines of all creditors listed on her bankruptcy proceeding,

including the tradeline of [HSBC]."  Complaint ¶ 16, Exh. 1 (Plaintiff's request to Equifax for

reinvestigation of tradelines).  The Plaintiff's Equifax credit report, dated May 15, 2006, shows

that the Account tradeline was updated to accurately reflect an activity description of

"Transfer/Sold" and a blank "Balance Amount."  Opp. to Summary Judgment, Exh. B (Equifax

Credit Report dated May 15, 2006).

The Plaintiff alleges that her TransUnion credit report, dated May 4, 2006, states that the

Account was closed by HSBC, and that the balance of approximately $4,867, was charged off as

bad debt.  Complaint ¶ 18, Exh. 2 (TransUnion Credit Report dated May 4, 2006).  The

TransUnion credit report also shows that the Account tradeline was last updated by HSBC in

October 2004, some five months before the Petition Date.  *Id*.

HSBC states that it last reported on the status of the Account in October 2004.  Miller

Decl. ¶ 3(g), Exh. G (Letter from Angela Z. Miller to Jay S. Fleischman dated August 14, 2006).

HSBC also states that it never received a notice of dispute from TransUnion.  Motion for

Summary Judgment, Declaration of Daniel E. Thiemann ("Thiemann Decl.") ¶ 3.

On May 23, 2006, the Plaintiff filed a motion to reopen her Chapter 7 bankruptcy case

for the purpose of commencing this Adversary Proceeding.  Bankruptcy Case No. 05-14317,

Docket No. 28.  The Court granted that motion by order entered on June 8, 2006.  Bankruptcy

Case No. 05-14317, Docket No. 31.  On June 26, 2006, the Plaintiff commenced this action.

Bankruptcy Case No. 05-14317, Docket No. 32.  *See* Docket No. 1.

During discovery, the Plaintiff requested information from HSBC about any

circumstances where HSBC was found to have violated an automatic stay or a discharge

injunction as well as circumstances where such claims were settled.  Aff. in Opp., Interrogatory

No. 1.  HSBC objected to these requests.  *Id*.  The Plaintiff also requested information from

HSBC on its system for terminating the collection process and correcting its reporting with a

credit reporting agency.  Aff. in Opp., Interrogatory No. 15.  HSBC also objected to these

requests.  *Id*.  The Plaintiff requested information on problems that HSBC encountered with

identifying accounts as discharged.  Aff. in Opp., Interrogatory No. 17.  Again, HSBC objected

to these requests.  *Id*.

The Plaintiff seeks actual, statutory, and punitive damages, and attorney fees and costs

from HSBC for violation of the Section 524 discharge injunction.  Complaint ¶ 86.  The Plaintiff

alleges that she has suffered and continues to suffer "adverse action, credit denials,

embarrassment, mental anguish, inconvenience, and other pecuniary and non-pecuniary

damages."  Complaint ¶ 25.  She also alleges that her ability to obtain credit is limited and that

she faces higher costs in future consumer transactions and may be denied loans for which she

would otherwise qualify.  Complaint ¶ 83;  *See* Complaint ¶¶ 24, 84; May 8 Hearing Tr. at

41:11-14.

As noted above, the Plaintiff has determined voluntarily to withdraw her claims for relief

under the Fair Credit Reporting Act, and for defamation in this Adversary Proceeding.  May 8

Hearing Tr. at 4:18-20.

## DISCUSSION

A. *The Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings by Bankruptcy Rule 7056, provides that summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 118 (Bankr. S.D.N.Y. 1997).

The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the Court in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 249, 256; *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, it must present "significant probative evidence" that a genuine issue of fact exists. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of fact for trial and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587. *See McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

7

2006).

B.      *The Plaintiff's FCRA and Defamation Claims*

HSBC seeks summary judgment on the Plaintiff's FCRA and defamation claims on grounds, among others, that this Court does not have subject matter jurisdiction over these claims, and that even if this Court does have subject matter jurisdiction, there is no genuine issue as to any material fact and HSBC is entitled to judgment as a matter of law.

As noted above, the Plaintiff has determined voluntarily to withdraw her claims for relief under the FCRA and for defamation in this Adversary Proceeding.  May 8 Hearing Tr. at 4:18-20.  As a result, it is not necessary for the Court further to consider HSBC's motion with respect to these claims.

C.      *The Plaintiff's Claims for Violation and Contempt of the Discharge Injunction*

HSBC seeks summary judgment on the Plaintiff's claims that it violated the discharge injunction under Section 524(a)(2) of the Bankruptcy Code.  HSBC bases this argument on two principal grounds.  First, HSBC argues that its failure to update its report on the status of the Plaintiff's Account to TransUnion following her bankruptcy discharge is not an act to collect on a discharged debt in violation of Section 524(a)(2).  Mem. in Support at 8.  HSBC argues that willfulness is required for this Court to find an action for contempt in violation of Section 524(a)(2) and asserts that the Plaintiff has not presented sufficient evidence to create a genuine issue of fact for trial on the question of whether its failure to update the report was willful. Mem. in Support at 6.

Second, HSBC argues that the Plaintiff must show that she suffered damages in order to state a claim for a violation of the discharge injunction, and urges that the Plaintiff has not

presented sufficient evidence to create a genuine issue of fact for trial on the question of whether

she suffered damages.  Mem. in Support at 8.

*Establishing a Violation of the Discharge Injunction of Section 524(a)(2)*

Section 524 of the Bankruptcy Code provides:

(a)     A discharge in a case under this title . . .

> (2)     operates as an injunction against the commencement or
> continuation of an action, the employment of process, or an act, to
> collect, recover or offset any such debt as a personal liability of the
> debtor, whether or not discharge of such debt is waived . . . .

11 U.S.C. § 524(a)(2).  One of the fundamental principles of bankruptcy law is that a bankruptcy

discharge enables a debtor to receive a "fresh start." *See Marrama v. Citizens Bank*, 127 S. Ct.

1105, 1107 (U.S. 2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start'

to the 'honest but unfortunate debtor.'") (citation omitted).  The Section 524 discharge injunction

serves this function by protecting debtors from creditors' attempts to collect discharged debts

after bankruptcy.[1]

---

[1]  The legislative history of Section 524(a)(2) confirms the statute's goal of providing a
fresh start for debtors who receive a discharge:

> Subsection (a) [of 11 U.S.C. § 524] . . . operates as an injunction against the
> commencement or continuation of an action, the employment of process, or any
> act, including telephone calls, letters, and personal contacts to collect[,] recover or
> offset any discharged debt as a personal liability of the debtor, or from property of
> the debtor, whether or not the debtor has waived discharge of the debt involved.
> The injunction is to give complete effect to the discharge and to eliminate any
> doubt concerning the effect of the discharge as a total prohibition on debt
> collection efforts.  This paragraph has been expanded over a comparable
> provision in Bankruptcy Act section 14f to cover any act to collect, such as
> dunning by telephone or letter, or indirectly through friends, relatives, or
> employees, harassment, threats of repossession and the like.  The change . . . is
> intended to insure that once a debt is discharged, the debtor will not be pressured
> in any way to repay it.  In effect, the discharge extinguishes the debt, and

9

In order to succeed on a Section 524 claim, a plaintiff bears the burden of linking a creditor's behavior with a violation of the Section 524 discharge injunction.  *See Torres v. Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007); *Puller v. Credit Collections USA, Inc. (In re Puller)*, 2007 WL 1811209 at *6 (Bankr. N.D. W. Va. 2007); *Mahoney v. Washington Mutual Card Servs. (In re Mahoney)*, 368 B.R. 579, 584 (Bankr. W.D. Tex. 2007) ("On Defendant's summary judgment motion, Plaintiff bears the burden of producing summary judgment evidence sufficient to raise an issue of material fact that connects Defendant's credit reporting with collection activity.").

Section 524 of the Bankruptcy Code does not define an "act to collect . . . any debt" and as a result, courts and commentators have concluded that it provides a "broad injunction" against a wide range of collection activities. COLLIER ON BANKRUPTCY ¶ 524.02[2] (15th ed. rev. 2007). As one commentator has noted, "[i]n enforcing the injunction, courts have encountered a wide variety of methods used by creditors to attempt to collect discharged debts." *Id.*; *see also* COLLIER ON BANKRUPTCY ¶ 524.02[2][b] (surveying cases identifying acts that violate the discharge injunction).

The legislative history of Section 524(a)(2) similarly supports a broad interpretation of an "act to collect . . . any debt" that violates the Section 524 discharge injunction. *See In re Torres*, 367 B.R. at 484-85 ("The statute's plain terms obviate consideration of its legislative history . . . but it is worth noting that the legislative history . . . also supports a broad reading of the

---

creditors may not attempt to avoid that.

H.R. REP. NO. 95-595, at 365-66 (1977); S. REP. NO. 95-989, at 80 (1978).  *See Torres v. Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 485 (Bankr. S.D.N.Y. 2007).

injunction contained in section 524(a)(2) . . . .") (citations omitted).

A plaintiff may bring a claim for a violation of the discharge injunction in the form of an action for a sanction for civil contempt. *In re Torres*, 367 B.R. at 490 ("[M]onetary relief sought by the plaintiffs in connection with [an] alleged breach of section 524(a) of the Bankruptcy Code is properly viewed as a sanction for civil contempt."). *See In re Puller* 2007 WL 1811209 at *3 (citing cases) ("A violation of the discharge injunction is punished by contempt of court."); COLLIER ON BANKRUPTCY ¶ 524.02[2][c] ("Civil contempt is the normal sanction for violations of the discharge injunction.").

To succeed on this claim, a plaintiff must show that a violation occurred by "clear and convincing evidence." *In re Puller*, 2007 WL 1811209 at *3; *In re Torres*, 367 B.R. at 490. And as the court in *In re Puller* notes, "[d]etermining whether a party may be held liable for civil contempt is a two part inquiry: (1) did the party know of the lawful order of the court, and (2) did the defendant comply with it." *In re Puller*, 2007 WL 1811209 at *3 (citing cases).

Many courts have held that the failure of a furnisher of credit information to take affirmative steps to update the information that it has reported on a consumer's account is not, standing alone, a violation of Section 524(a)(2). For example, in *Bruno v. First USA Bank, N.A. (In re Bruno)*, 356 B.R. 89 (Bankr. W.D.N.Y. 2006), the court found that a creditor does not violate Section 524(a)(2) by failing to notify a credit reporting agency that the debtor's delinquent account should be corrected to note the debtor's bankruptcy discharge. *In re Bruno*, 356 B.R. at 92.

Similarly, in *Helmes v. Wachovia Bank, N.A. (In re Helmes)*, 336 B.R. 105 (Bankr. E.D. Va. 2005), the court concluded that a bank that mistakenly reported debt as due rather than

11

discharged, absent any other evidence that it did so with the intent to collect the debt, did not violate the discharge injunction.  *In re Helmes*, 336 B.R. at 109.  *See also Irby v. Fashion Bug (In re Irby)*, 337 B.R. 293, 296 (Bankr. N.D. Ohio 2005) (creditor's failure to take steps to ensure that debt previously discharged in bankruptcy was removed from a debtor's credit report, without any other attempts to collect the debt from the debtor, did not violate the discharge injunction); *Vogt v. Dynamic Recovery Servs. (In re Vogt)*, 257 B.R. 65, 71 (Bankr. D. Colo. 2000) (the failure to correct a debtor's false credit report, if not done to extract payment of a debt, does not violate the discharge injunction).

At the same time, a violation of the discharge injunction may be found where the failure to update or correct a credit report is willful.  As one court recently found, "[f]or the Court to find a party in contempt '"the burden rests with the movant to show [by clear and convincing evidence] that the offending . . . entity had knowledge [actual or constructive] of the discharge and willfully violated it by continuing with the activity complained of."'"  *In re Torres*, 367 B.R. at 490 (citing cases).  *See also Russell v. Chase Bank USA, N.A. (In re Russell)*, 2007 WL 4267789 at *4 (Bankr. E.D.N.Y. 2007) (actions prohibited by Section 524(a)(2) include "a deliberate refusal to correct information previously supplied to credit reporting agencies, for the purpose of coercing [a debtor] to repay a discharged debt.") (citation omitted); *Cultera v. People's Bank (In re Cultera)*, 2007 WL 117747 at *2 (Bankr. D. Conn. 2007) ("'Willful violation of the injunction imposed by § 524(a)(2) will warrant a finding of civil contempt.'") quoting *Waswick v. Stutsman County Bank*, 212 B.R. 350, 352 (Bankr. D.N.D. 1997).

In this context, in order to succeed on its Motion for Summary Judgment, HSBC must show that the Plaintiff cannot succeed at trial on at least one of the components of its claim; that

is, that HSBC was aware of the Plaintiff's bankruptcy discharge; that it was aware that it was reporting on the status of the Account incorrectly; that it had the ability to update or correct its reporting on the status of the Account after the Plaintiff received her bankruptcy discharge; and finally, that it willfully did not do so. *See* COLLIER ON BANKRUPTCY ¶ 524.02[2][c] ("A creditor's actions in violation of the discharge injunction are willful if the creditor knows the discharge has been entered and intends the actions which violate the discharge injunction."). If HSBC establishes that the Plaintiff cannot succeed on any one of these components, then it is entitled to the entry of judgment as a matter of law.

In addition, HSBC's Motion for Summary Judgment may succeed if HSBC shows that it is entitled to judgment as a matter of law because there is no genuine issue of fact as to whether the Plaintiff has suffered any damages as a result of its alleged violation of the discharge injunction.

### *Whether HSBC has established that there is no genuine issue of fact as to whether HSBC knew of the Plaintiff's bankruptcy discharge*

The first issue that the Court must address is whether HSBC has established that there is no genuine issue of fact as to whether it was aware of the Plaintiff's bankruptcy discharge.

Here, the parties dispute whether HSBC received notice of the entry of a discharge in the Plaintiff's bankruptcy case. As noted above, the record shows that on August 17, 2005, the Plaintiff received a discharge. Bankruptcy Case No. 05-14317, Docket No. 8. The Certificate of Mailing with Order of Discharge, dated August 19, 2005, states that a predecessor of an HSBC affiliate, Household Retail Services, received notice of the Plaintiff's discharge. Bankruptcy Case No. 05-14317, Docket No. 9. HSBC denies that it received notice of the Plaintiff's discharge. Answer ¶ 8.

13

For these reasons, and based on the entire record, HSBC has not established that there is no genuine issue of fact as to whether HSBC knew of the Plaintiff's discharge.

> *Whether HSBC has established that there is no genuine issue of fact as to whether HSBC was aware that the tradeline for the Account on the Plaintiff's TransUnion credit report was incorrect*

The next issue that the Court must address is whether HSBC has established that there is no genuine issue of fact as to whether it was aware that the tradeline for the Account on the Plaintiff's TransUnion credit report was incorrect or, viewed another way, whether the record shows that there is no genuine issue of fact as to whether HSBC received notice of the Plaintiff's dispute about the reporting of the Account with TransUnion.

Here, the parties dispute whether HSBC received notice of the Plaintiff's dispute with respect to the tradeline for the Account on her TransUnion credit report. The Plaintiff notes that the Fair Credit Reporting Act provides that if a furnisher of credit information conducts a reinvestigation of a tradeline and discovers that it is inaccurate or incomplete, then the furnisher must report those results to "*all other* consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis . . . ." 15 U.S.C. § 1681s-2(b)(1)(D) (emphasis added). *See* Opp. to Summary Judgment ¶ 43. The Plaintiff reasons that since the record shows that HSBC "received a request for reinvestigation from Equifax," and the tradeline for the Account on her Equifax credit report was updated to show the sale of the Account, there is a genuine issue of fact as to whether HSBC was aware of the Plaintiff's April 28, 2006, reinvestigation and dispute with Equifax. Opp. to Summary Judgment ¶ 44. *See* Opp. to Summary Judgment ¶¶ 41-45; Aff. in Opp. ¶ 34; May 8 Hearing Tr. at 36:5-9. The Plaintiff also argues that additional discovery is required to establish whether

TransUnion transmitted, or HSBC received, notice of the disputed tradeline.  Aff. in Opp. ¶¶ 36-37; Opp. to Summary Judgment ¶ 45.  And more generally, the Plaintiff argues that additional discovery of HSBC's reporting of the Account, and internal practices and procedures for handling disputes, is required.  Aff. in Opp. ¶¶ 21-37.

HSBC denies that it received notice of the Plaintiff's dispute with TransUnion with respect to the tradeline describing the status of the Account.  Answer ¶ 3.  HSBC also denies reporting on the Account since 2004.  Answer, p. 4 (Ninth Defense); Mem. in Support at 8; Reply to Aff. at 6; Miller Decl. ¶ 3(g) and Exh. G (Letter from Angela Z. Miller to Jay S. Fleischman dated August 14, 2006).  HSBC also acknowledges updating the Equifax tradeline for the Account in May 2006.  May 8 Hearing Tr. at 27:10-12.  *See* Opp. to Summary Judgment, Exh. B (Equifax Credit Report dated May 15, 2006).  HSBC states that the Plaintiff "has alleged at best a failure to investigate (Complaint ¶¶ 16-18), which is entirely incorrect."   Mem. in Support at 17.

Here, the record shows that HSBC has taken different positions with respect to whether it updated the Equifax tradeline for the Plaintiff's Account in May 2006.  *See, e.g.*, Answer, p. 4 (Ninth Defense); May 8 Hearing Tr. at 27:10-12.  The record also shows, or at a minimum, supports the inference, that the Equifax tradeline for the Plaintiff's Account was updated with an accurate report of the Account's status.  Opp. to Summary Judgment ¶ 44, Exh. B (Equifax Credit Report dated May 15, 2006).  *See* Aff. in Opp. ¶ 34.  The record further supports the inference that, at that same time, HSBC did not update the TransUnion tradeline for the Account with this information.  *See* Complaint ¶¶ 16-19, Exh. 2 (TransUnion Credit Report dated May 4, 2006).

For these reasons, and based on the entire record, HSBC has not established that there is no genuine issue of fact as to whether HSBC was aware that the TransUnion report on the status of the Plaintiff's Account was incorrect.

> *Whether HSBC has established that there is no genuine issue of fact as to whether HSBC had the ability to update or correct the TransUnion report on the status of the Plaintiff's Account after the Plaintiff received her bankruptcy discharge*

The next issue that the Court must address is whether HSBC has established that there is no genuine issue of fact as to whether HSBC had the ability to update or correct the TransUnion report on the status of the Plaintiff's Account at any time after the Plaintiff received her bankruptcy discharge.

HSBC asserts that it sold the Plaintiff's Account to Arrow in October 2004, some five months before the Plaintiff commenced her bankruptcy case in March 2005.  Mem. in Support at 8.  HSBC acknowledges that "[o]n September 11, 2006, HSBC . . . agreed to undertake to update the trade line regarding the Account to reflect a pay status of 'bankruptcy' and a balance owing of $0."  Mem. in Support at 5.  HSBC argues that once it sold the Plaintiff's Account, it no longer had the ability to update the tradeline for the Account with the credit reporting agencies. Supp. Mem. in Support at 2.

The Plaintiff argues that the record supports the inference that HSBC knew of the Plaintiff's April 28, 2006, reinvestigation and dispute with Equifax.  Opp. to Summary Judgment ¶ 44.  The Plaintiff also asserts that since HSBC updated the tradeline for the Plaintiff's Account with Equifax in May 2006, more than eighteen months after HSBC sold the account to Arrow, there is a genuine issue of fact as to whether HSBC had the ability to update or correct the tradeline for the Plaintiff's Account in the TransUnion credit report.  *Id*.  And here too, the

Plaintiff argues that additional discovery of HSBC's reporting of the Account, and internal practices and procedures for handling disputes, is required. Aff. in Opp. ¶¶ 21-37.

For these reasons, and based on the entire record, HSBC has not established that there is no genuine issue of fact as to whether HSBC had the ability to update or correct the TransUnion report on the status of the Plaintiff's Account at any time after the Plaintiff received her bankruptcy discharge.

### *Whether HSBC has established that there is no genuine issue of fact as to whether HSBC willfully failed to update or correct the TransUnion report on the status of the Plaintiff's Account*

Finally, the Court must determine whether HSBC has established that there is no genuine issue of fact as to whether HSBC willfully failed to update or correct the tradeline on the Plaintiff's Account.

As described above, the failure of a furnisher of credit information to update a consumer's credit report may not, standing alone, violate the discharge injunction. *See* pp. 11-12, *supra*. But the willful failure of a furnisher of credit information to update or correct the information provided to a credit reporting agency may give rise to a claim for a violation of the discharge injunction. Several courts have recently considered what a plaintiff must plead and prove in order to establish the willfulness element of such a claim.

In *In re Puller*, the debtor brought an adversary proceeding against a creditor, Credit Collections, alleging that the creditor did not timely update its report about the status of the debtor's account after the debtor received a discharge in bankruptcy. The court denied the creditor's motion for summary judgment and found:

> To the extent that the Debtor can prove that Credit Collections intentionally failed to report, or intentionally delayed reporting, updated collection information in the

17

> hopes that the Debtor may voluntarily repay her discharged debt in an effort to
> clean-up the Debtor's credit report, then such actions may be viewed as setting a
> trap for the Debtor and then lying in wait to see if the bait is taken.  In this court's
> view, trap hunting can constitute a violation of the discharge injunction.

*In re Puller*, 2007 WL 1811209 at *7.  That is, a creditor's intentional failure to update a credit

report with the hope that this will lead the debtor to repay the debt may amount to contempt of

the discharge injunction.

In *Lohmeyer v. Alvin's Jewelers (In re Lohmeyer)*, 365 B.R. 746 (Bankr. N.D. Ohio

2007), the court considered a debtor's claim that the creditor's failure to update its reporting of

his pre-petition debt after his Chapter 7 discharge violated the discharge injunction and noted:

> If Plaintiff . . . can prove that Defendant inaccurately reported or failed to update
> the status of the debt as a current liability of Plaintiff's . . . for the purpose of
> coercing payment by Plaintiffs notwithstanding the discharge, which would
> essentially amount to lying in passive wait, then in this court's view a violation of
> the discharge injunction will have occurred without other overt collection action
> such as letters or harassing telephone calls.

*In re Lohmeyer*, 365 B.R. at 750.  Here too, the court concluded that a creditor's inaction in the

face of an inaccurate credit report, when accompanied by a "purpose of coercing payment," was

sufficient to state a claim for a willful violation of the discharge injunction.  *Id.*

In *In re Torres*, the Bankruptcy Court for the Southern District of New York employed a

similar analysis and concluded that the plaintiff stated a claim for a violation of the discharge

injunction where she alleged both that the creditor did not update her credit report following her

bankruptcy discharge and that the creditor intentionally did not update the report in order to

coerce the debtor to pay the debt.  *In re Torres*, 367 B.R. at 489.  The court noted that "false or

outdated reporting to credit reporting agencies, even without additional collection activity, can

constitute an act to extract payment of a debt in violation of section 524(a)(2)."  *In re Torres*,

367 B.R. at 486 (citing cases).

Finally, in *In re Mahoney*, the court reasoned that courts should look to the larger context to assess a creditor's intent and determine whether a creditor's failure to update or correct a report to a credit reporting agency constitutes an act to collect in violation of Section 524(a)(2). In granting the creditor's motion for summary judgment, the court noted that "[t]he act of credit reporting *could* be part of a larger course of conduct that, taken together, might constitute an act likely to be effective to collect a debt . . . ." *In re Mahoney*, 368 B.R. at 589.

HSBC argues that there is no genuine issue of fact as to whether it intentionally failed to update the Plaintiff's Account. HSBC argues that *In re Torres* and other decisions issued in the context of a motion to dismiss are not controlling because, in those cases, the courts were required to assume that all of the allegations of the complaint were true and determine only whether they stated a claim upon which relief could be granted. Supp. Mem. in Support at 9.

HSBC also argues that *In re Torres* may be distinguished because there, the plaintiff alleged that the creditor refused to update the plaintiff's credit report after receiving requests to do so. Supp. Mem. in Support at 3. *See In re Torres*, 367 B.R. at 489.

And HSBC argues that those cases do not provide a basis to find a genuine issue of fact as to whether its failure to update the tradeline for the Plaintiff's Account with TransUnion was willful because, unlike the creditors there, HSBC did not own the obligation when the Plaintiff received a bankruptcy discharge. Supp. Mem. in Support at 2-3. For this reason, HSBC asserts, the creditor in *In re Torres* had an incentive to collect on the debt that is lacking here. *Id*. As HSBC's counsel stated:

> So another distinguishing factor from even the cases which . . . are willing to accept that reporting alone can constitute a violation, is that we don't own the

19

debt anymore.  Undisputed.  That's a very distinguishing factor . . . as far as establishing a lack of any possible intent.

May 8 Hearing Tr. at 17:3-8.

The Plaintiff alleges that "[r]eporting a balance on this discharged debt is an attempt to collect the discharged debt to which inexperienced, frightened or ill-counseled debtors may succumb."  Complaint ¶ 68.  The Plaintiff also argues that despite the fact that HSBC sold the Plaintiff's Account to Arrow and no longer owned the debt, it retained a financial interest in Arrow's ability to collect on the Account from the Plaintiff for at least two reasons.

First, the Plaintiff argues that the Forward Flow Agreement provides a specific financial incentive to HSBC in the form of a fee of five percent of the payments made on the Account, and all of the other accounts sold to Arrow, more than four months after they are transferred.  This gave HSBC a financial incentive to make the Account more likely to be collectible by Arrow.  Opp. to Summary Judgment ¶ 20; FFA ¶ 6 cited in Opp. to Summary Judgment ¶ 19.

And second, the Plaintiff argues that HSBC has a general financial incentive in the form of its interest in continuing to sell its credit card accounts to Arrow pursuant to the Forward Flow Agreement.  As the Plaintiff argues:

> [R]eally this goes towards HSBC's pattern and practice in their ordinary course of business of selling charged off debt. . . . [It] stems from looking at a combination of the forward flow agreement providing a credit enhancement to HSBC as well as reducing the carrying cost of that debt to Arrow . . . . Arrow didn't need to write a letter.  Arrow didn't need to buy a stamp.  Arrow didn't need to pull somebody off of a call center to make collection calls.  Arrow, all they needed to do was sit back and theoretically wait for the money to come in. . . . So if we look at the forward flow agreement. . . . [I]n the event that discovery pans out, and if it is HSBC's pattern and practice to collect on a large number of these accounts which we submit that it is, Your Honor, there's your willfulness right there.

May 8 Hearing Tr. at 37:15-16; 37:23-38:1; 38:3-16.

Here, the record shows or, at a minimum, supports the inference, that HSBC retained a direct financial interest in the Plaintiff making payments on the Account.  HSBC's direct interest, in the form of its right under the Forward Flow Agreement to collect a fee of five percent of the payments received by Arrow more than four months after the Account was transferred, may be viewed as modest as a matter of absolute dollars.  On the Plaintiff's account balance of less than $5,000, for example, full payment would have yielded to HSBC a fee of less than $250.  But HSBC transferred nearly ten thousand accounts along with the Plaintiff's Account, and if a similar recovery was made on each transferred account – or even on a fraction of those accounts – then the potential recovery, and HSBC's direct financial interest, would be far greater.

Equally important, the record shows or, at a minimum, supports the inference, that HSBC retained an indirect financial interest in the Plaintiff making payments on the Account.  HSBC entered into the Forward Flow Agreement, dated May 15, 2002, in order to sell its credit card accounts to Arrow.  The Forward Flow Agreement had been in place for almost two and one-half years at the time that HSBC sold the Plaintiff's Account to Arrow, and the record does not suggest that the sales arrangements put in place by the agreement were rescinded or otherwise terminated thereafter.  It seems clear that it was in HSBC's financial interest for Arrow to collect on the accounts that it purchased.

As noted above, other bankruptcy courts have recently recognized that a failure to update a tradeline to reflect the status of an account may be an intentional – and effective –  tool to induce a debtor to make payments on an account.  As the court found in *In re Torres*:

> One may reasonably infer that prospective lenders rely on the accuracy of credit reports when deciding whether to extend credit; if the credit reports show an

outstanding, overdue debt, prospective lenders will assume that the plaintiffs have fewer resources with which to pay back a new loan. Indeed, the pressure of not getting a new mortgage or having to pay a higher rate because of a credit report's inaccurate characterization of a discharged debt could well exceed the irritation caused by dunning letters, which one who knows his or her rights under Bankruptcy Code section 524(a) may throw in the trash without fear of adverse consequences. It is reasonable to infer that [a creditor] whose business involves making and evaluating credit disclosures, knows this.

*In re Torres*, 367 B.R. at 485-86. *See In re Puller*, 2007 WL 1811209 at *7.

The record also shows that the Plaintiff requested information from HSBC about any circumstances where HSBC was found to have violated the automatic stay or discharge injunction, and circumstances where HSBC settled such claims. Aff. in Opp., Interrogatory No. 1. The Plaintiff also requested information on HSBC's system for terminating the collection process and correcting its reporting with the credit reporting agencies, as well as problems that HSBC encountered with identifying accounts as discharged. Aff. in Opp., Interrogatory Nos. 15, 17. HSBC objected to each of these requests and did not respond to them. *Id.*

For these reasons, and based on the entire record, HSBC has not established that there is no genuine issue of fact as to whether HSBC willfully failed to update or correct its reporting on the status of the Plaintiff's Account after the Plaintiff received her bankruptcy discharge.

> ### Whether HSBC has established there is no genuine issue of fact as to whether the Plaintiff has suffered damages

In addition to the elements of the Plaintiff's claim described above, the Court must determine whether HSBC has established that there is no genuine issue of fact as to whether the Plaintiff suffered damages as a result of HSBC's alleged violation of the discharge injunction.

HSBC argues that the Plaintiff's claim cannot succeed because she cannot show, as a matter of law, that she has suffered any compensable damages. Mem. in Support at 8-10. HSBC

acknowledges that the Plaintiff "seeks 'actual, statutory and punitive damages, attorneys fees and costs'" and acknowledges that she alleges that "she suffered 'adverse action', 'credit denials', 'embarrassment', 'mental anguish', 'inconvenience', and other pecuniary and non-pecuniary damages, and damaged her 'ability to enjoy life.'" Mem. in Support at 9. But HSBC notes that there are no statutory damages available for a violation of the discharge injunction, argues that the Plaintiff does not allege the kind of pattern of misconduct that could provide a basis for an award of punitive damages, and "offers no proof of actual damages, including attorney's fees." *Id*. *See* Reply to Supp. Affirm. and Opp. at 10-11.

The Plaintiff argues that HSBC has not met the legal standard for summary judgment on her claim for contempt of the discharge injunction. *See* Aff. in Opp. ¶¶ 51-57; Opp. to Summary Judgment ¶¶ 12-34. The Plaintiff does not address specifically the nature of her alleged damages.

Bankruptcy Code Section 524 does not provide for a statutory award of damages for a violation of the discharge injunction. 11 U.S.C. § 524(a)(2). But such violations are not without consequences. As one commentator has observed, "[i]n cases in which the discharge injunction was violated willfully, courts have awarded debtors actual damages, punitive damages and attorney's fees." COLLIER ON BANKRUPTCY ¶ 524.02[2][c].

In *In re Torres*, the court reviewed the law on damages for willful violations of the discharge injunction and observed:

> It has been held that attorneys fees also may be awarded if, in addition to showing that the breach of the discharge injunction was willful, it is established that the defendant acted in bad faith or in a vexatious or oppressive manner. *In re Dabrowski*, 257 B.R. 394, 416 (Bankr. S.D.N.Y. 2001); *In re Cruz*, 254 B.R. [801, 816 (Bankr. S.D.N.Y. 2000)]. . . . The essence of the plaintiffs' allegations is that [the furnisher of credit information] has continued to lay a trap for them

23

until the eventual day that they need an accurate credit report. [*In re Lohmeyer*,
365 B.R. 746,] 2007 Bankr. LEXIS 909, at *10. Such behavior, if proven at trial,
would be sufficiently vexatious and oppressive to support at least a sanction in the
amount of the plaintiffs' costs and expenses incurred in releasing the trap,
separate and apart from any sanction to coerce future compliance with section
524(a)(2).

*In re Torres*, 367 B.R. at 490-91. An award of punitive damages may also be available relief.

*See In re Russell*, 2007 WL 4267789 at *7 ("conduct amounting to a calculated and deliberate

attempt to collect a discharged debt, if proven at trial, may meet the standard of misconduct

required for an award of punitive damages.").

Here, as in *In re Torres*, the record shows that the there is a genuine issue of fact as to

each of the elements of the Plaintiff's claim for a violation of the discharge injunction. The

Plaintiff faces a substantial burden at trial to demonstrate each of these elements, and her burden

to demonstrate that HSBC acted willfully is particularly heavy. At the same time, if she is

successful, then an award of damages including a civil contempt sanction measured by the

amount of her attorney's fees and litigation costs, and punitive damages, may be an appropriate

remedy.

For these reasons, and based on the entire record, HSBC has not established that there is

no genuine issue of fact as to whether the Plaintiff suffered damages as a result of the alleged

violation of the discharge injunction.

## **CONCLUSION**

For all of these reasons and based on the entire record, the Court concludes that there are

genuine issues of material fact with respect to the Plaintiff's claim for a violation of the

discharge injunction.  Accordingly, HSBC's Motion for Summary Judgment is denied.  An order

in accordance with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York
         December _**11**_, 2007

                                   _**S/Elizabeth S. Stong**_                              
                                   ELIZABETH S. STONG
                                   UNITED STATES BANKRUPTCY JUDGE